IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

WEATHERLY GRAHAM, *et al.*,
    *Plaintiffs*,

v.

STATE OF MARYLAND, *et al.*,
    *Defendants*.

Case No. 23-cv-1777-ABA

**MEMORANDUM OPINION**

Two Baltimore City Sheriff's Office Deputies were attempting to serve a warrant on a public street when an approximately 68-pound dog that was unrestrained began running toward them. When the dog, which was growling and baring its teeth, was between three and eight feet from the officers, they shot the dog. Plaintiffs Weatherly Graham, who owned the dog, and Justin Lane, who helped care for the dog, filed this case, alleging the shooting was unconstitutional. Because the deputies' conduct was objectively reasonable even drawing all reasonable inferences from the admissible evidence in the light most favorable to Plaintiffs, and because Plaintiffs have otherwise not come forward with evidence sufficient to make out their common law causes of action, Defendants are entitled to summary judgment on all of the claims.

**I.     BACKGROUND[1]**

On April 8, 2020, Deputies Alain Hawley and Scottie Washington of the Baltimore City Sheriff's Office (the "Deputies") arrived at the 3500 block of West

---

[1] On a motion for summary judgment, the Court "must construe the evidence in the light most favorable to the non-moving party." *Perdue v. Sanofi-Aventis U.S., LLC*, 999 F.3d 954, 958 (4th Cir. 2021). Because Defendants have moved for summary judgment, the

1

Franklin Street in Baltimore, Maryland, a residential block. ECF No. 50-4, Deposition of Deputy Alain Hawley ("Hawley Dep.") 5:14–16, 26:6–8; ECF No. 50-5, Deposition of Officer Scottie Washington ("Washington Dep.") 8:3–5, 25:17–20. The Deputies were there to serve a temporary protective order and multiple warrants upon an individual they believed resided at 3510 West Franklin Street. ECF No. 50-4, Hawley Dep. 18:18–19:10; ECF No. 50-5, Washington Dep. 25:17–20. The Deputies parked their car on the corner of West Franklin Street and Edgewood Street, near 3500, exited their vehicle, and began walking toward 3510. ECF No. 50-4, Hawley Dep. 36:13–37:6, 39:8–21; ECF No. 50-5, Washington Dep. 30:8–14.[2]

As the Deputies began walking up the street, they saw a brown pitbull dog between 3509 and 3510. ECF No. 50-4, Hawley Dep. 39:20–40:6, 66:1–4; ECF No. 50-5, Washington Dep. 33:11–16, 36:8–9; ECF No. 50-6, Deposition of Kirby West ("West Dep.") 29:4–5. The dog weighed approximately 68 pounds. ECF No. 50-7, Deposition of Weatherly Graham ("Graham Dep.") 38:7–9. The Deputies were unfamiliar with the dog and did not know if it was a stray dog or if it belonged to someone in the neighborhood. ECF No. 50-4, Hawley Dep. 63:3–7, 64:1–8; ECF No. 50-5, Washington Dep. 60:6–9. As the Deputies continued their approach to 3510 and were within approximately fifteen to twenty feet of the dog, the dog began to stare at the Deputies, showed its teeth, and

---

following is a recitation of the admissible evidence in the light most favorable to Ms. Graham and Mr. Lane.

[2] Unless otherwise indicated, all four-digit numbers beginning with "35" are references to house numbers on West Franklin Street. Any references to addresses beginning with "38" in the deposition transcripts will be construed as beginning with "35" as was clarified by Deputy Hawley at the end of his deposition. *See* ECF No. 50-4, Hawley Dep. 132:7–20. Per the record, no events occurred on the 3800 block of West Franklin Street.

2

began growling, prompting the Deputies to take a couple steps back. ECF No. 50-4, Hawley Dep. 40:20–41:10; ECF No. 50-5, Washington Dep. 36:15–37:2, 60:3–6. The dog then ran toward the Deputies at a high speed. ECF No. 50-4, Hawley Dep. 41:9–14; ECF No. 50-5, Washington Dep. 36:16–21; ECF No. 50-6, West Dep. 29:7–10, 32:10–33:2. Deputy Hawley testified that the dog got from where it was originally standing, about three houses away, to within a few feet of the Deputies within about two seconds. ECF No. 50-4, Hawley Dep. 49:18–50:11. Once the dog was within between three and eight feet of the Deputies,[3] they unholstered their service weapons and each fired two to three rounds at the dog. ECF No. 50-4, Hawley Dep. 41:15–16; ECF No. 50-5, Washington Dep. 36:19–37:20; ECF No. 50-6, West Dep. 30:10–20. Deputy Hawley estimated that the entire incident, between when he first saw the dog and when he shot it, occurred within approximately thirty seconds to one minute. ECF No. 50-4, Hawley Dep. 50:20–51:13. The incident was witnessed by a neighbor, Kirby West, who lived at 3515 and was sitting on his porch as the incident occurred. ECF No. 50-6, West Dep. 13:2–6, 20:7–20, 26:12–14.

At the time of the shooting, the Deputies' car was parked approximately 30 to 40 feet from where they were standing. ECF No. 50-4, Hawley Dep. 72:16–73:9. At the time the dog was shot, it had never touched, bitten, scratched, or jumped at either Deputy or anyone else in the Deputies' presence. ECF No. 50-4, Hawley Dep. 99:21–100:3; ECF No. 50-5, Washington Dep. 43:2–10. At the time of the shooting, both Deputies were

---

[3] Deputy Hawley estimated that the dog was approximately six to eight feet away, or the width of a car, at the time of the shooting. ECF No. 50-4, Hawley Dep. 45:14–46:2; 99:14–20. Deputy Washington estimated that the dog was approximately three to five feet away at the time of the shooting. ECF No. 50-5, Washington Dep. 39:17–19.

armed with mace and a baton. ECF No. 50-4, Hawley Dep. 29:6–15; ECF No. 50-5, Washington Dep. 46:2–3. The Deputies did not attempt to use their mace or baton or use verbal commands before discharging their weapon. ECF No. 50-4, Hawley Dep. 50:16–19, 51:14–52:18.

It was later determined that the dog's name was "Boy" and that he belonged to Weatherly Graham, who lived with Justin Lane and Chice Watkins at 3500. ECF No. 50-7, Graham Dep. 41:9–14, 52:17–18; ECF No. 50-8, Deposition of Justin Lane ("Lane Dep.") 55:8–9; 56:8–13. Ms. Watkins was the only person home at the time of the incident and had "let Boy out the door [and] went back in [the house] to grab something." ECF No. 50-7, Graham Dep. 63:17–1. The house has a small front yard, but it is not enclosed by a fence; so, when Boy was let out of the house, he was free to roam down the street. *Id.* 26:7–8; 27:6–18. Ms. Watkins had been inside the house for a few minutes when she heard gunshots. *Id.* 64:1–8. Neither Ms. Graham nor Mr. Lane (the Plaintiffs) witnessed the incident as they were both at work at the time it occurred. *Id.* 51:8–14; ECF No. 50-8, Lane Dep. 76:16–77:6.[4]

---

[4] Those are the undisputed facts, or the admissible evidence that is disputed but is recounted in the light most favorable to Plaintiffs. Plaintiffs contend certain other facts, such as that Boy was in his own yard when he was shot, *see* ECF No. 51 at 14–16; that assertion, however, is unsupported by any admissible evidence, because the undisputed testimony of the eyewitnesses to the incident (including the neighbor, Mr. West) places Boy outside of Plaintiffs' yard. Other facts are disputed, such as about Boy's general demeanor at other times (*see* ECF No. 50-7, Graham Dep. 32:5–8, 45:14–21, 46:19–47:2). But for the reasons discussed below, those disputes are immaterial; regardless of Boy's demeanor on other days, the undisputed admissible evidence establishes that the Deputies' conduct on April 8, 2020 was objectively reasonable.

## II.     Standard of Review

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A moving party meets its burden when the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case" and when the nonmovant bears "the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the non-moving party fails to confront the motion with "sufficient evidence . . . for a jury to return a verdict for that party," the movant is entitled to summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex*, 477 U.S. at 323 ("[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."). In making this determination, the Court views all facts, and all reasonable inferences drawn from those facts, in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587–88.

## III.    Discussion

### A.    The Deputies' actions did not violate the Fourth Amendment or Article 26 of the Maryland Declaration of Rights

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "[I]t is well-settled that privately owned dogs are 'effects' under the Fourth Amendment, and that the shooting and killing of such a dog constitutes a

5

'seizure.'" *Ray v. Roane*, 948 F.3d 222, 227 (4th Cir. 2020) ("*Ray I*") (*quoting Altman v. City of High Point, N.C.*, 330 F.3d 194, 203–05 (4th Cir. 2003)). A warrantless seizure of a dog is presumed to be unconstitutional; however, an officer's seizure can be constitutional if it is shown to have been "reasonable." *Altman*, 330 F.3d at 205 (citing *United States v. Place*, 462 U.S. 696, 701 (1983)). "Under the basic reasonableness calculus, a court must 'balance the nature and quality of the intrusion on the individual's Fourth Amendment interest against the importance of the governmental interests alleged to justify the intrusion.' The reasonableness calculus is objective in nature; it does not turn upon the subjective intent of the officer." *Id.* (*citing Place*, 462 U.S. at 703) (internal citations omitted); *see Ray I*, 948 F.3d at 227.

Article 26 of the Maryland Declaration of Rights provides the state analog to the Fourth Amendment as a prohibition of unreasonable searches and seizures without a warrant or probable cause. Md. Const. Decl. of Rts. art. 26. "[T]he standard for analyzing claims of excessive force by police officers are the same under Articles 24 and 26 of the Maryland Declaration of Rights"; "the test is one of objective reasonableness, as set forth in the U.S. Supreme Court's Fourth Amendment case[s]." *Smith v. Bortner*, 193 Md. App. 534, 544 (2010).[5]

---

[5] For the first time during the motions hearing, Plaintiffs requested that, should the Court conclude that there was no violation of the Fourth Amendment, the Court should decline to exercise supplemental jurisdiction over Plaintiffs' claims under the Maryland Constitution, arguing that the Maryland Constitution is more protective than the United States Constitution on this issue. The Court granted Plaintiffs leave to file supplemental authority on this issue. *See* ECF No. 59. The Court rejects Plaintiffs' request to distinguish between the federal and state constitutional claims, and to bifurcate them, for two reasons. First, Plaintiffs not only forfeited this argument by not raising it in their response to the motion for summary judgment, but affirmatively waived it when they stated that, "[f]or purposes of both state and federal constitutional law, the touchstone

In assessing the reasonableness of law enforcement seizures of pets (including deadly use of force), the Fourth Circuit has repeatedly acknowledged the significant interest owners have in their pets. *See Altman*, 330 F.3d at 205; *Ray I*, 948 F.3d at 227. But "dog owners forfeit many of these possessory interests when they allow their dogs to run at large, unleashed, uncontrolled, and unsupervised, for at that point the dog ceases to become simply a personal effect and takes on the nature of a public nuisance." *Altman*, 330 F.3d at 206; *see also Davis v. Clayton*, Case No. 7:17-cv-02076-LSC, 2018 WL 3475438, at *6 (N.D. Ala. July 19, 2018) ("When the Plaintiffs' dogs escaped, Plaintiffs' possessory rights over the dogs greatly diminished"). "When a dog leaves the control of his owner and runs at large in a public space, the government interest in controlling the animal and preventing the evils mentioned above waxes dramatically, while the private interest correspondingly wanes." *Altman*, 330 F.3d at 205; *see also Brown v. Muhlenberg Tp.*, 269 F.3d 205, 210 (3rd Cir. 2001) ("Where a pet is found at large, the state undoubtedly has an interest in restraining it so that it will pose no danger to the person or property of others.").

Of course, the fact that an animal is unrestrained does not necessarily entitle law enforcement to use force, let alone deadly force, to restrain the animal. But "[i]f a dog is showing signs of aggression (baring teeth, ears back, tail straight, lunging, growling, snarling, barking, or charging), courts regularly find that it is reasonable for officers to

---

of the analysis is the reasonableness of the shooting." ECF No. 51 at 21. Second, regardless, *Smith* instructs that the objective reasonableness standard under Article 26 is the same as under the Fourth Amendment. *See Smith*, 193 Md. App. at 544 (cited in ECF No. 51 at 21). Plaintiffs did not point any cases in its supplemental brief where a different standard was applied to seizures under Article 26. *See* ECF No. 59 at 3–5; ECF No. 60 at 1–2. Accordingly, the Article 26 claim will be analyzed under the same standard as the Fourth Amendment claim.

defend themselves." *Strong v. Perrone,* Case No. 17-CV-6183-FPG, 2020 WL 1445877, at *4 (W.D.N.Y. Mar. 25, 2020) (*citing Carroll v. Cnty. of Monroe*, 712 F.3d 649, 652 (2d Cir. 2013)). And in some circumstances, "the use of deadly force against a household pet" can be objectively reasonable—but "only if the pet poses an immediate danger and the use of force is unavoidable." *Ray v. Roane*, 93 F.4th 651, 654 (4th Cir. 2024) (*Ray II*) (*quoting Ray I*, 948 F.3d at 230); *see also Carroll*, 712 F3d at 652 (finding lethal force could be reasonable where the dog was growling, barking, and quickly approaching the police officer); *Grant v. City of Houston*, 625 F. App'x 670, 677–78 (5th Cir. 2015) (finding lethal force was reasonably used where the dog was biting at police officer's legs and aggressively barking); *Kendall v. Olsen*, 237 F. Supp. 3d 1156, 1169 (D. Utah Feb. 17, 2017) (finding lethal force was reasonably used where the dog charged at the police officer and lunged with ears back and a straight tail while barking loudly, snarling, and baring its teeth).

    In weighing the relevant interests, a court must focus on the circumstances confronting the officers at the moment they fired their weapons. *Ray I*, 948 F.3d at 227 (*citing Greenidge v. Ruffin*, 927 F.2d 789, 792 (4th Cir. 1991), and *Altman*, 330 F.3d at 205-06). And reasonableness is not determined based on what the officers' best possible response could have been in the situation, but rather whether, "under the circumstances existing at the time the officers took the actions and in light of the facts known by the officers, their actions were objectively reasonable." *Altman*, 330 F.3d at 207. Even if in "retrospect" it "may have been preferable if the officers attempted first to use nonlethal force," "[e]ven dog owners can find their pets to be unpredictable at times," let alone "a person who is not intimately familiar with the behavior of the particular animal . . . and

8

who is forced to confront the dog for the first time in an unsupervised, unenclosed environment." *Id.*

The Fourth Circuit's opinions in *Altman* and *Ray* (both *Ray I* and *Ray II*) illustrate why Defendants are entitled to summary judgment here. In *Altman*, the Fourth Circuit found the officers' actions to be reasonable in each of the four incidents at issue. The first involved a large dog that had been reported for having chased and attacked someone in the neighborhood; the officer shot the dog in the backside as it was approximately ten to twelve feet away and walking away from the house back out toward the public. *Altman*, 330 F.3d at 197. The second involved a pack of dogs, including 3 of the plaintiff's dogs and 2 strays, that were attacking people, including the officers; the officer discharged his shotgun at the pack, killing two dogs. *Id.* at 198. The third involved a large dog that had been reported for having bit someone while running loose and then charged at the officer at full speed while growling and showing his teeth; the officer discharged his shotgun when the dog was approximately five yards away. *Id.* at 198–99. The fourth involved a dog that a person had previously observed act aggressively and then the dog ran toward a residential area once the officer arrived; the officer shot the dog when it was approximately fifty yards away. *Id.* at 199. In ruling that the officers' actions were reasonable in each of these incidents, the court acknowledged that the officer may have, in hindsight, had options other than using lethal force. But based on the circumstances before the officers in the moments leading up to the shooting, each officer had a substantial interest in self-defense or protecting the public that sufficiently outweighed the dogs' owners' interests such that shooting the dogs was objectively reasonable. *Id.* at 206.

In *Ray II*, in contrast, a reasonable jury could have construed the admissible evidence as showing that the dog posed no immediate threat, which would mean the officer's use of deadly force was objectively unreasonable. *Ray II*, 93 F.4th at 657–58 & n.4. The officer there approached the plaintiff's house, where he was attempting to serve an arrest warrant. *Id.* at 652. Instead of parking his car in the driveway like other officers who were present, he parked his car in the plaintiff's yard within the plaintiff's dog's play area and exited his vehicle despite warnings from the other officers to wait. *Ray I*, 948 F.3d at 225. And plaintiff's dog was attached via zip-lead to two trees in the yard that limited its movement. *Ray II*, 93 F.4th at 652. Despite having put himself in the dog's play area against direction and in contrast to the other officers, and despite the dog being physically unable to reach the officer, the officer "stopped backing away from Jax when the dog reached the end of the zip-lead, and then took a step towards the dog before firing his weapon." *Id.* at 656 (*quoting Ray I*, 948 F.3d at 228). There was sufficient evidence there to require a jury trial regarding the disputed facts (but not on the "ultimate question of objective reasonableness," which "is a purely legal issue for the court to decide"). *Id.* at 657 n.4, 658.

Here, *Altman* entitles Defendants to summary judgment, and *Ray* does not counsel otherwise. There is no genuine dispute that Boy was on a public street or sidewalk (not a fenced yard or attached to a zip line), was not leashed, and was without supervision. Similar to *Altman*, Plaintiffs' interest decreased significantly once Boy was roaming free in the street and was not being actively supervised by anyone. The Deputies did not arrive to West Franklin Street with any knowledge that a dog would be present, and did not, for example, place themselves in the dog's own yard or otherwise unnecessarily put themselves in proximity with the dog. They were serving a warrant on

10

a public street, and the undisputed evidence establishes that the dog approached them—and did so rapidly, showing its teeth. The undisputed admissible evidence also establishes that the officers waited until the dog was just eight feet away from them (or possibly as few as three feet) before using deadly force. And the Deputies could not, for example, step outside the reach of the dog (such as in *Ray*, where the dog was restrained by a zip lead) or get into their patrol vehicles, which were down the block. These facts dramatically increase the Deputies' interest in self-defense and in protecting the public and establish that "the pet pose[d] an immediate danger and the use of force [wa]s unavoidable," *Ray*, 93 F.4th at 654, and thus that the Deputies' decisions to shoot Boy were objectively reasonable.

Plaintiffs argue that "Boy never touched, bit, scratched, or jumped on either of the deputies or any other person while the deputies were present," and that those facts weigh in favor of finding that the Deputies' actions were unreasonable, or at least that there are sufficient factual disputes to proceed to a trial. *See* ECF No. 51 at 22–24. However, in *Altman,* where the court found the officers' actions to be reasonable, the officers did not have to wait until the dogs committed *actual* harm in front of the officers. Rather the test is whether the Deputies held a reasonable belief that they were in imminent danger and that the use of force was unavoidable. Plaintiffs also argue that the Deputies' failure to attempt to use verbal commands, hand gestures, their mace, or their baton prior to lethal force is also evidence that their actions were unreasonable. *Id*. Although the Deputies had other options at their disposal, it is undisputed that the entire incident, from the first time the officers saw the dog until the shooting, took place within thirty to sixty seconds and, even more significantly, that the time from when the dog began running toward the Deputies until it got within eight feet of them took only

about two seconds. The Court cannot determine reasonableness based on what the *best* possible option could have been in hindsight but rather must consider the circumstances confronting the Deputies in those two seconds. *See Altman*, 330 F.3d at 207; *Ray I*, 948 F.3d at 227. In those two seconds, the Deputies were confronted with a loose, 68-pound, unfamiliar dog that was running directly toward them at full speed, growling and baring its teeth. In these circumstances, based on the undisputed evidence in the light most favorable to Plaintiffs, the Court holds that the Deputies' actions were reasonable such that the seizure was not a violation of the Fourth Amendment of the U.S. Constitution or Article 26 of the Maryland Constitution.

It is significant that the only eyewitnesses to the incident were the Deputies, and Mr. West, the neighbor who observed the incident. Neither Ms. Graham nor Mr. Lane were present. The eyewitnesses' testimony, viewed in the light most favorable to Plaintiffs, establishes the facts described above. Ms. Graham testified that Boy had a "chill, laid back" temperament, did not generally bark, obeyed some hand commands, and was generally "very friendly" around strangers. ECF No. 50-7, Graham Dep. 32:5–8; 46:17–47:2. Indeed, in some circumstances evidence of a dog's demeanor can bear on whether officers acted reasonably. *See Myers v. Town of Elkton*, 745 F. Supp. 3d 219, 239 (D. Md. 2024) (*citing Strong*, 2020 WL 1445877, at *4-5; *Ray II*, 93 F.4th at 656–57; *Stanton v. Elliott*, 25 F.4th 227, 234 (4th Cir. 2022)). But here, none of that evidence contradicts the evidence of the eyewitnesses, and all the evidence by the eyewitnesses establishes, for the reasons explained above, that the officers reasonably perceived that they were in immediate danger and that the use of force was unavoidable.

Plaintiffs rely on this Court's decision in *Myers*, 745 F. Supp. 3d at 219. But unlike here, in *Myers* there were genuine disputes of material facts including regarding

whether the dog was acting aggressively, whether the officer had a reasonable belief that he was in imminent danger of harm, whether the officer had unnecessarily created the situation by entering a fenced yard despite being warned of the presence of dogs, and whether the officer could have climbed out of the fenced area or deployed an alternative to his firearm. *Id.* at 240. In that case, the officers were aware that there were three dogs on the property prior to arriving and had been given specific instructions on how to relay information to the residents without interacting with the dogs but chose not to follow those instructions. *Id.* at 227–28.

The Court's holding here is further supported by, for example, *Davis*, in which the court held the officer's actions were objectively reasonable when he shot and killed one dog and tased the other as both were large dogs roaming free such that he could not be sure if they had owners or if they were strays, they were near the dead dog that the officer had been dispatched to take care of such that he believed that they may have been the cause of its death, and the dogs aggressively barked at and charged at a city employee. *Davis*, 2018 WL 3475438, at *1, 5.

For these reasons, Defendants' motion for summary judgment as to Counts I and V will be granted.[6]

---

[6] Given that summary judgment will been granted based on Defendants' constitutional argument, the Court need not and does not analyze the Defendants' qualified immunity argument.

13

### B. The Deputies are also entitled to summary judgment as to the state law claims

#### 1. Trespass to chattels and conversion claims (Counts III and IX)

Trespass to chattels is "an intentional use or intermeddling with the chattel in possession of another [which] occur[s], *inter alia*, when 'the chattel is impaired as to its condition, quality, or value.'" *United States v. Arora*, 860 F. Supp. 1091, 1097 (D. Md. 1994) (*quoting* Restatement (Second) of Torts, § 217(b), § 218(b) (1965); *citing Walser v. Resthaven Mem'l Gardens, Inc.*, 98 Md. App. 371, 395 (1993)) (internal citations omitted). Conversion is "an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." *Id.* (*quoting* Restatement (Second) of Torts, § 222A(1); *citing Staub v. Staub*, 37 Md. App. 141 (1977)). "To establish conversion, a plaintiff must prove: (1) plaintiff's right to possess the property; and (2) defendant's intentional taking of the property without authority or permission." *Froelich v. Erickson*, 96 F. Supp. 2d 507, 525-26 (D. Md. 2000) (*citing Travel Comm. v. Pan Am. World Airways, Inc.*, 91 Md. App. 123, 183 (1992)). Claims for trespass to chattels and conversion are similar but differ in degree (and thus in damages that are awarded); however, a single interference with property only allows for recovery under one theory. *Staub*, 37 Md. App. at 144–45.

It is undisputed that Plaintiffs had a right to possess their dog, Boy. The question here is whether the Deputies' actions constitute an *intentional* taking. Defendants argue that their actions were not an intentional taking as they were acting in self-defense when faced with a charging, unsupervised dog. ECF No. 50-1 at 19–20. Indeed, Maryland law expressly protects from civil or criminal liability a person who kills a dog "that the

person sees in the act of . . . attacking a human being." Md. Code Ann., Local Gov't § 13-105(a)(2), (b). "Attacking" is not defined in the statute. Finally, Defendants point to the general proposition that "[i]f an injury was done by a defendant in justifiable self-defense, he can neither be punished criminally nor held responsible for damages in a civil action." *Balt. Transit Co. v. Faulkner*, 179 Md. 598, 600 (1941) (*citing New Orleans & Ne. R.R. Co. v. Jones*, 142 U.S. 18 (1891)). Plaintiffs' primary argument as to why summary judgment should not be granted for the trespass to chattels and conversion claims echoes their argument from the Fourth Amendment claim that there are genuine disputes of material facts regarding whether the Deputies were acting in self-defense. ECF No. 51 at 28–29.

Here, for essentially the same reasons as those establishing that Defendants' conduct was objectively reasonable for constitutional purposes, Defendants' conduct did not constitute trespass to chattels or conversion. It is clear from the undisputed evidence that the Deputies reasonably believed they were in immediate danger and that the use of force was unavoidable. Mr. West, the neighbor, also testified that he did not think the Deputies had done anything wrong; he thought they were protecting themselves and testified that he would have reacted in the same manner. ECF No. 50-6, West Dep. 31:3–14. In short, the Deputies' actions were in self-defense or in defense of the public and, therefore, do not constitute an intentional taking. Accordingly, summary judgment will be granted as to the Counts III and IX.

### 2. Gross negligence (Count VII)

Gross negligence is "something more than simple negligence, and likely more akin to reckless conduct." *Barbre v. Pope*, 402 Md. 157, 187 (2007) (*quoting Taylor v. Harford Cnty. Dep't. of Soc. Servs.*, 384 Md. 213, 229 (2004)). Gross negligence is "an

15

intentional failure to perform a manifest duty in *reckless disregard* of the consequences as affecting the life or property of another, and also implies a *thoughtless disregard* of the consequences without the exertion of any effort to avoid them." *Id.* (*quoting Liscombe v. Potomac Edison Co.*, 303 Md. 619, 495 A.2d 838, 846 (1985); *Romanesk v. Rose*, 248 Md. 420, 423 (1968)) (emphasis added).

Plaintiffs argue that summary judgment should not be granted for the gross negligence claim because there are genuine disputes regarding whether the Deputies were acting in self-defense. ECF No. 51 at 28–29. They further argue that *Brooks v. Jenkins* and *Anne Arundel Cnty. v. Reeves* should be considered instructive on the state law claims. *Id.* at 29–30; ECF No. 59 ¶¶ 2–6; that *Brooks v. Jenkins,* 220 Md. App. 444 (2014); *Anne Arundel Cnty. v. Reeves,* 474 Md. 46 (2021). Plaintiffs argue that both cases "are factually similar to this case as officers shot a family dog which had not bitten or harmed the officer, in the family's yard, without first retreating or using non-lethal alternatives." ECF No. 51 at 30. But Plaintiffs overstate the factual overlap and the courts' conclusions in those cases.

In *Brooks*, the Appellate Court of Maryland explained that gross negligence requires that the defendant "acted either with the intent to inflict injury or with 'utter indifference' to the rights of others." 220 Md. App. at 461–62. The court held that the trial court had properly permitted the jury to consider the gross negligence claim as there was video evidence that the dog was wagging her tail as she approached the deputy and that she did not approach at an inordinate speed or in a crouched position and, rather than using a lesser form of force, the deputy aimed his gun directly at the dog's chest. *Id.* at 462. In coming to this conclusion, the court stated that "the evidence

16

sufficed to support the jury's finding that the Deputy overreacted to the potential threat, responded with excessive force, and acted with reckless indifference." *Id.*

In *Reeves*, the Supreme Court of Maryland held that, although the officer testified that the dog growled and barked once as it approached him, a reasonable juror could have found that the dog did not attack him, especially in light of the expert testimony that the dog was facing *away* from the officer when he shot it. 474 Md. at 75. Although the officer's uniform had muddy paw prints from the plaintiff's dog, the expert testimony regarding the positioning of the dog at the time of the shooting, combined with the fact that "like in *Brooks*, there was no evidence that [the dog] was vicious or threatening," provided sufficient evidence for a rational juror to find that the officer was grossly negligent. *Id.* at 55, 75. Upon this finding, the court upheld jury's verdict. *Id.*

Unlike in *Brooks*, it is undisputed that Boy approached the Deputies at a fast speed and there is no evidence to indicate that Boy was wagging his tail or taking any other action to indicate that he was coming to play rather than attack. Additionally, unlike in *Brooks* and *Reeves* where both incidents occurred on the plaintiffs' property, the Deputies came face to face with an unknown dog in the middle of a public street and therefore could not have known that Boy was a family pet or anything about his general temperament. Furthermore, in *Reeves*, unlike here, the deputy did not shoot the dog until after the dog had touched him *and began walking away from him*; accordingly, any reasonable fear of imminent danger substantially decreased by the time the shooting had occurred. Here, it is uncontested that the Deputies shot Boy as he was approaching them. Nothing in *Brooks* or *Reeves* indicates that the decision was made solely or even primarily based on the dog not having bitten or harmed the officers prior

17

to the shooting. *See Brooks*, 220 Md. App. at 461–62; *Reeves*, 474 Md. at 75. *But see* ECF No. 51 at 30.

Because the Deputies' actions were objectively reasonable, *infra* § III(A), there is insufficient evidence for a reasonable jury to find that the Deputies acted with "*reckless*" or "*thoughtless disregard* of the consequences." *Barbre*, 402 Md. at 187. Accordingly, summary judgment as to Count VII will be granted.

### C. The State is entitled to summary judgment as to the negligence claim (Count VI) as there was no breach of duty

A claim of negligence requires "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty." *Valentine v. On Target, Inc.*, 353 Md. 544, 549 (1999) (*quoting Balt. Gas & Elec. Co. v. Lane*, 338 Md. 34, 43 (1995)); *see also Bobo v. State*, 346 Md. 706, 714 (1997). The question before the Court is whether the Deputies breached a duty of reasonable care with regard to Plaintiffs' dog.[7]

During the motions hearing, Defendants argued that, to the extent the Deputies owed any duty to Plaintiffs, that duty was not breached as the Deputies were acting with reasonable care when they shot the dog in self-defense. Plaintiffs argue that, for the same reasons as stated in the prior claims, Defendants' use of lethal force was not justified and the Deputies breached their duty to Plaintiffs by unreasonably utilizing their lethal weapons. ECF No.51 at 32.

---

[7] The Court assumes, without deciding, that the Deputies owed a duty to Plaintiffs.

The Court holds that, for the same reasons the Deputies' actions were objectively reasonable, the Deputies utilized reasonable care and, therefore, did not breach any duty they owed to Plaintiffs. Accordingly, summary judgment as to Count VI will be granted.

## IV.   Conclusion

For the aforementioned reasons, Defendants' motion for summary judgment will be granted[8] and judgment will be entered for Defendants on all remaining counts. A separate order follows.

Date:  January 13, 2026             _____/s/_____
                                     Adam B. Abelson
                                     United States District Judge

---

[8] Because the Court concludes Defendants are entitled to summary, the Court need not address Defendants' argument regarding Mr. Lane's standing.